JOHN AMMONS, APPELLANT, vs. THE STATE OF FLORIDA.

1. Upon a change of venue in a criminal case, the transmission of the copy of proceedings, including the order for change of venue, accompanied with the original indictment and other necessary papers mentioned in the order (if any) of the Court, prima facie satisfies the statute.

2. The making of the order changing the venue in such a case and adjourning the Court without revoking it, vested, *eo instanti*, jurisdiction in the Circuit Court of the county to which the cause is forwarded. The jurisdiction cannot be in abeyance.

3. In all criminal cases, whether upon a change af venue or otherwise, the trial should be upon the original indictment, unless by some *express* act the Court is authorized to use a copy thereof.

4. When the venue in a criminal case has been changed, the prisoner may raise the question of the sufficiency of the transcript from the Court in which the indictment was found, and may require the production of all necessary papers not sent forward, and should not be forced to trial without them.

5. If a prisoner go to trial in such a case on an imperfect transcript, without objection, he waives all right to object in arrest of judgment.

6. Where in a criminal case there is conflicting evidence, and attempt made on the trial of the cause to impeach a witness, which failed, the jury giving credit to the testimony of the witness, this Court will not review their action.

7. The common law of England in relation to crimes is adopted and declared

to be in full force in this State, excepting only so far as the same relates to the modes and degree of punishment.

8. The record being in *fieri* and under the control of the Court during the entire term, its completion at any time before the final judgment relates back and heals previous informalities.

This case was argued at Marianna and decided at Talla-hassee.

The following statement of the case was prepared by the Judge who delivered the opinion of the Court :

John Ammons, the appellant, was indicted at the Fall Term, 1858, of the Circuit Court of Holmes county, for the murder of one Samuel McQuage. The record sets .forth that on the 3d November, 1858, the Grand Jury of Holmes county came into Court and presented the bill of indictment, a copy of which is given in the record, and upon inspection of the original indictment presented by prisoner's counsel in argument, it appears to have been filed by the clerk of said Court on that day. Afterwards, on the application of the prisoner, a change of venue was granted by the Court to Jackson county, the order for which reads as follows, viz : "It appearing to the Court upon the affidavit of the prisoner that he fears he cannot have a fair and impartial trial in the county of Holmes, on account of the prejudice existing against him, it is ordered that the venue in this case be changed to the Circuit Court of the county of Jackson, to be begun and held at Marianna on the second Monday of the present month. It is further ordered that all the witnesses for both the prosecution and defence, be recognized to be and appear at said Circuit Court of Jackson county on Tuesday of the second week of the term thereof, to testify in said case, and not depart without leave of said Court. It is further ordered that the clerk of this Court do transmit to the clerk of the Circuit Court of Jackson county the indictment and all the original papers

in this prosecution on file in his office, together with a copy
of all the recognizances of the witnesses recognized to ap-
pear and testify in this case. And it is further ordered that
the Sheriff of the county of Holmes do safely convey the
prisoner to the jail of the said county of Jackson, and there
deliver him to the Sheriff of the said county of Jackson,
to be safely confined in said jail."

In pursuance with this order, the clerk of the Circuit Court
of Holmes, sent forward to the clerk of said Court in Jackson
county a transcript as ordered and the original indictment.
No copy of the indictment was included in the transcript of
the record. At said term of the Court in Jackson county,
it appears by the record the prisoner was arraigned and
plead not guilty, and upon his motion, supported by affida-
vit, the cause was continued.

At the July Term, 1859, the trial was continued on mo-
tion of prisoner.

Fall Term, 1859, the prisoner was put upon his trial and
a verdict of guilty rendered. The prisoner moved for a new
trial, which was granted.

At Spring Term, 1860, prisoner made motion to amend
the record so as to show that the said verdict was set aside
and new trial granted upon other grounds than those em-
bodied by prisoner in his motion for new trial, which motion
was refused by the Court and excepted to. The cause was
then called for second trial, and on hearing the indictment
read, the prisoner pleaded *former conviction*, to which plea
the State replied that the new trial was awarded the prisoner
on his own motion, and the prisoner demurred to the replica-
tion, which demurrer was overruled, and the prisoner per-
mitted to join issue upon the said replication ; whereupon a
jury was empannelled to try the issue thus joined, and re-
turned as their verdict that said new trial was awarded the
prisoner on his motion.

The prisoner was then again arraigned, and plead not guilty to the indictment.

Whereupon, on the application of the prisoner and for good cause shown, the venue was changed to Calhoun county.

The order changing this venue reads as follows, viz :

" And whereupon, on the application of the prisoner, and for good cause shown by his affidavit, together with the testimony of Henry O. Bassett, the present Sheriff, James J. Rigby, Franklin Hart, George W. Bassett and Benjamin G. Alderman, the Court doth order the venue to be changed to the Circuit Court for the county of Calhoun, that being the most convenient Court where, in the opinion of the Judge of this Court, the State of Florida and the prisoner can have a fair and impartial trial, and the said John Ammons is remanded to jail, there to remain till his removal to the Circuit Court of said county of Calhoun at its next term, to be held on Monday, the 14th day of the present month, (May)."

Subsequently the Sheriff of Jackson county was ordered by the Judge to convey the prisoner to the Court to be held in Calhoun county, and deliver him to the Sheriff of Calhoun county, and the Sheriff of Calhoun county ordered to take the prisoner into custody.

A certified copy of the recognizance of witnesses and of the record of the case in Jackson county, together with the original indictment, was transmitted by the clerk of the Court in Jackson to the clerk of the Court in Calhoun. This transcript of the record from Jackson county did not contain any part of the transcript from Holmes county to Jackson, nor a copy of the indictment, nor did it contain the affidavit of prisoner for a new trial, or the plea of former conviction, the replication, demurrer, or other papers filed, but did contain a certified copy of the minutes of the Court thereon, including finding of the jury and all orders. The clerk of the

Court of Calhoun county issued a *venire facias*, and the prisoner was put upon his trial without any arraignment in Calhoun county, but as the record states, "*the prisoner having been previously arraigned, plead not guilty.*" No suggestions of diminution of the transcript of the record was made by the prisoner, nor was there any demand for any of the papers. The jury were called, empannelled and sworn. After hearing the evidence, argument of counsel and charge of the Court, the jury retired, and afterwards returned into Court with a verdict of guilty. A motion in arrest of judgment was made, and among the grounds for the arrest, the prisoner alleges the absence of these papers from the transcript, and "that the defendant has not been tried upon any sufficient indictment of file in the Circuit Court of Calhoun county, Florida, and that it does not appear from the record and papers of file in the Circuit Court of Calhoun county that there is on file in said Court any indictment against him for the murder of Samuel McQuage," and that "the original indictment found by the Grand Jurors of Holmes county, or a paper purporting to be said indictment, was read to the jury who tried him, without being first filed in the Circuit Court clerk's office of the county of Calhoun."

While the motion in arrest was pending, the State, by her Solicitor, moved to file upon his affidavit the following papers as of the 15th day of May, 1860, viz : the one purporting to be the original indictment found in Holmes county, which had endorsement of filing thereon, by the respective clerks of Holmes and Jackson counties; and the other purporting to be a certified copy of an indictment found in the Circuit Court of Holmes county ; which motion was allowed, to which the prisoner excepted. The motion in arrest of judgment being denied, the prisoner was sentenced. A writ of error is sued out to this Court under the statute. J. F. McClellan for appellant, who cited, Harrell vs. The State,

2 Ala., 56; 9 Paige, 572–4; Sedgwick on Statutes, 323, 324, 347, 292, 319; 8 Yerger, 170; Laura vs. The State, 26 Mississippi, 174; 13 Smedes & Marshal, 260.

FORWARD, J., delivered the opinion of the Court.

There are fifteen errors assigned in this cause; of these the first ten involve the same question, and will be considered together. They are as follows, viz:

First. The record of the Court in Calhoun Circuit Court was not such as judgment and sentence could be entered up against prisoner.

Secondly. Because the record did not show a perfect transcript of the proceedings in this case in Holmes and Jackson counties.

Thirdly. The record from Holmes county did not embody a copy of the indictment against the defendant.

Fourthly. The orders changing the venue from Holmes to Jackson and from Jackson to Calhoun, do not comply with the statute.

Fifthly. The transcript from Jackson county does not embody the transcript of the record from Holmes county.

Sixthly. It does not contain a copy of the indictment against defendant, or any paper upon which he could be tried, for any offence known to the law.

Seventhly. That the transcript of the record from Jackson county does not set out and contain an affidavit for new trial, a motion to amend the record, a plea, demurrer, replication, a copy of indictment and exceptions taken, and other proceedings.

Eighthly. The record of Calhoun county did not contain any indictment or copy of file upon which the prisoner could have been tried or was compelled to answer.

Ninth. It was error to try prisoner upon a paper purport-

ing to be an original indictment from Holmes county, and it should not have been read to the jury.

Tenth. That the record is otherwise imperfect, defective, erroneous and unintelligible, and does not give the prisoner the benefit of the proceedings had in his case in the counties of Holmes, Jackson and Calhoun ; that he is unable to avail himself of his exceptions taken in his case in Jackson county, and which were signed and sealed in said Court.

The statute authorizing the change of venue in a criminal case provides that " the prisoner shall be remanded into the custody of the proper officer, who shall convey him to, and have him imprisoned in the jail of the county where he is to be tried : in all such cases a *certified copy of the recognizance taken, and of the record of the case, and the proceedings thereon, with all other necessary papers*, shall be transmitted to the clerk of the Court in which the trial is to be had, who, upon receipt thereof, shall issue a *venire facias*, directed to the ministerial officer of his Court, and any and all the proceedings which may be had in the trial of such criminal shall be the same as though the case had originated in that Court ; " " and all such cases so removed shall be tried in the same manner in the county to which they are removed, as if the offence had been committed and the prosecution originated in the county to which they are so removed." Thomp. Digest, 525.

In considering the errors, it becomes necessary to give construction to this statute, in order that it may appear whether it was satisfied and jurisdiction in consequence thereof given to the Court held in the county to which the venue was changed.

The legality of the order for changing the venue both from Holmes to Jackson and from Jackson to Calhoun, is not questioned ; it is, however, urged that the record of the Court was not such as judgment and sentence could be en-

tered upon against the prisoner, and the various defects pointed to in the assignment of errors.

Among them it is contended that the statute required a certified copy of the indictment to be transmitted to the clerk, and that this was necessary to give jurisdiction to the Court to which the venue is changed, and that the original indictment is not a satisfaction of the statute.

There is no doubt but that in strict legal construction, an indictment duly presented to, and received by the Court, is a part of "the record of the case;" but the question arises, was this the meaning of the Legislature in the use of those words, and if so, was it the transmission of the copy of the record which gave jurisdiction to the Court, or the order changing the venue? It will be observed that the statute, after authorizing the change of venue and prescribing how it shall be done, goes on to say, "*in all such cases* a certified copy of the recognizance taken, *and of the record of the case,* and the proceedings therein, with *all other* necessary papers, shall be transmitted to the clerk, &c., who, upon receipt thereof, shall issue a *venire facias*," &c.

We think the Legislature, in the use of the words "the record of the case," meant the *minutes* or entries on the record book of the Court, and thereby did not intend to include a copy of the indictment, which, from the well known practice of our Courts, never is copied on the minutes of the record of the Court, and this view is strengthened from the fact that they, in addition thereto, use the words, "*with all other necessary papers.*" What "*other*" necessary papers" did they mean? It is clear they meant such *other* papers as were not entered upon the minutes. Recognizances, if taken in open Court, are always entered upon the minutes of the Court; they therefore had to be certified. This was a necessity provided for, but it was not of necessity to certify a copy of the indictment.

The well established policy of all our Courts, is to try the prisoner upon the indictment presented to the Court, and not upon a copy of the indictment. Never is a copy resorted to unless by express provision, and fully authorized and required by law. This practice being so uniform and considered the most correct and salutary, and more consonent with a proper regard to the constitutional provision for presenting an accusation under a criminal charge, that we cannot but consider our Legislature included the indictment as one of the "other necessary papers." Under this view of the statute, we think the order of the Court made in Holmes county was pre-eminently correct, and that had not said order directed the sending forward the indictment, it would have been the duty of the clerk to have sent the same.

The order changing the venue from Jackson to Calhoun is silent as to what papers should be transmitted. The duty, however, of the clerk is prescribed by the statute, and we are to presume he performed his duty unless the contrary appear. The record shows the order changing the venue, a copy of the recognizance taken, a copy of the record, and the indictment. It is presumed the prisoner was tried on the original as is admitted.

It does not appear from the record that the prisoner, before going to trial, made any suggestions of a diminution of the record transmitted, or made any question of the sufficiency of the transcript, or made application for any paper whatever, nor did he make any objections to going to trial, either in Jackson or Calhoun county.

After the conviction in Calhoun county, and in the motion in arrest of judgment, for the first time it appears the prisoner raises objections to the sufficiency of the record.

In considering these objections and the time when they should have been taken, and whether fatal in error, we are to ascertain whether the Court in Calhoun county, where

the prisoner was tried, and at his trial had jurisdiction of the case, which involves the enquiry as to whether the order changing the venue vested the jurisdiction, or whether the transcript of record, &c., were essential to the order to give the jurisdiction.

This is determined by asking whether the jurisdiction could be in abeyance ? That it could not be in abeyance is clear, therefore, when the Court in Jackson county adjourned without revoking the order changing the venue. We are of the opinion the jurisdiction vested *eo instanti* in the Circuit Court of the county of Calhoun.

It follows then that it is not the certified copy required by the statute which confers or creates the jurisdiction. The transcript is simply the *evidence* of a fact which already exists independently of it. Shifflet's Case, 14 Grattan, 669.

We do not wish to be understood as deciding that the Court in Calhoun, to which the venue was changed, could rightfully try the prisoner in the absence of the indictment, the copy of the order changing the venue, or any other copy of the record of the case, or any other necessary paper being *evidence* of the charge against him. But we do hold that when the clerk is in possession of what purports to be a full transcript of the record, the indictment and evidence of the charge and change of venue, that this is sufficient to authorize him to issue *venire facias* as directed by the statute, and the Court can proceed with the trial, unless satisfactory objections are made apparent, for the presumption of law is in favor of the correctness of the proceedings. Ward vs. The State, 28 Ala., 59.

In such cases there is no doubt the prisoner may raise the question of the sufficiency of the transcript of the record, or the proceedings in the case, and may demand and have furnished him all necessary papers, and the prisoner should not be forced to trial without them.

Before going into a trial, the prisoner, if he has any such objections to make, should object to the informalities of the transcript of the record, and by going to trial without objection, on the imperfect copy of the record on file, the prisoner waived all right to object in arrest of judgment, on account of the alleged imperfection. Doty vs. The State, 6 Black., 529; Laforte vs. The State, 6 Missouri, 208; Ellick vs. The State, 1 Swan, 329; Greenwood's Case, 5 Porter, 474; Matthew's Case, 9 Porter, 370.

The eleventh error assigned is, that the Court erred, after the trial and conviction of prisoner, in ordering the clerk to file and mark certain papers in his office purporting to relate to his cause.

The permission given by the Court was to file certain papers which the clerk had omitted to do. These papers are set forth to be the original indictment and a copy of the indictment. It appears that the original indictment had already been filed in both Holmes and Jackson counties. The copy of the indictment we have already considered an immaterial paper. We think that once filing was sufficient—there cannot be but one record of a case part may be in one court and part of it in the other. In this case the original having been sent on, the filing of the indictment once was sufficient for the purpose of furthering proceedings. At any rate, this objection, like the others, should have been raised before the trial. The Court having ordered it to be filed after the verdict, did no more than a Court has a right to do under the general rule. The record being in *fieri* and under the control of the Court during the entire term, its completion at any time before the final judgment relates back and heals previous informalities. Franklin vs. The State, 28 Ala., 9; The State vs. Mathews, 9 Porter, 370; The State vs. Greenwood, 5 Porter, 474.

The opinion of the Court is, that where an original indict-

ment or any other papers have been transferred on a change of venue to another county, at the term at which the same was transferred for trial, the Court may at any time during that term, as well after as before conviction, cause the clerk to endorse the indictment "filed," to date the endorsement according to the fact, and file it. Over such matters the Court has control during the term, and may alter, amend, or set them aside as justice may require.

The 12th, 13th, 14th and 15th errors assigned will be considered together, and are as follows:

Twelfth. That the judgment and sentence of the prisoner upon the record was against law.

Thirteenth. That the finding of the jury was against the weight of evidence in the case.

Fourteenth. The Court erred in charging the jury that no affront by base words or jestures, however false or malicious and aggravating with the most provoking circumstances, will free the party killing from the guilt of murder, and this rule will apply in every case where the party killing upon such provocation makes use of a deadly weapon, or otherwise manifests an intention to kill or to do some great bodily harm.

Fifteenth. The verdict was against evidence.

The following is the testimony as appears in the bill of exceptions:

Nancy Sutley says: I know John Ammons the prisoner; he left my house with Samuel McQuage the deceased, in the morning, and at night he returned with him, and when they drove up to the yard fence, I think Ammons called out to Carrol, (Joseph). After he called out to Carrol he cursed McQuage and kept cursing him, trying to make him get up and let him go home with him. McQuage would tell him to let him alone, that he had nothing against him. Mc-

29

Quage asked for water, and Carrol told him to come to the water shelf and get it, that there was water there. McQuage came to the pail and took a drink of water and turned round and set down in the door. When McQuage left my door he went out to the fence and got over the fence, and Ammons came to him, (McQ.,) and said G—d d—n your old soul, I intend to kill you. McQuage said, Ammons go away and let me alone, I have nothing against you. Then Ammons commenced striking over so, (showing the manner.) I did not see what he had in his hand ; they scrambled over the fence into the yard, and they both came right on by my door, and Ammons was beating him, (McQ.,) and he kept begging him to let him go, that he had nothing against him. They went on by the corner of my water shelf, and there Ammons knocked him down with his gun. It was there he gave him the last blow, and McQuage said, can't you let a poor old man go, and Ammons said no, G—d d—n you, I intend to kill you. At the lick of the gun the old man fell, and I did not hear him fetch but very few struggles. Ammons turned from McQuage and came to my door, and I said, Mr. Ammons you have killed him. He says yes, G—d d—n his old soul, and what I have not done with my gun I have done with my knife. He laid the muzzle or barrel of the gun on my water shelf, and said the breech is here in the yard somewhere, and I will get it, and have it mended some time. I sent off Carrol for company, and when he started Ammons stooped over the body of McQuage as if he designed to take hold of him, and says, now G—d d—n your old soul, if you were alive I reckon you would know that you could die and I could live. He, (Ammons,) then came into the house and set down on my table, and cursed the old man, (McQ.,) all the time while Carrol was gone for company.

When Carrol returned, he did not get any company, and I told him to stay there while I was gone for my son who

lived about 200 yards or more from my house. I took a piece of lightwood with fire and went out after my son. Ammons came out and went with me, walking all the way by the side of the road, and cursing McQ., and when we got to my son's, Ammons said, Harry don't be scared ; I have killed old man McQuage down at your father's.

I took my son and his wife and children, and went back home, and Ammons went with us. My son said, John you have killed him, have you, and Ammons replied yes, G—d d—n his old soul, I wish it was to do again. I left my son and his wife to watch McQ. while I went off for company, I took Joe Carrol with me; I left Ammons with my son and wife, and he was there when I got back. I went on to Field's and got him to let his little son go with Carrol for company, and I returned home. When I got back I found Ammons standing on the outside of the fence. He asked me, what I was going to do, and I told him I was going to build a fire by the old man to watch until I could get company, and he then said to my son, Harry, if the Sheriff comes after me tell him I will be out at my father-in-law's (whose name is Hodge.) He then left, and I saw him no more until he was taken and brought back. This occurred in September. It was last September a year ago, at night; it might have been two or three hours in night, I am not certain, they got there an hour or an hour and a half in the night. I will not be certain as to the time of night, in Holmes county in the State of Florida. The cart stopped at fence, it may be ten or twelve steps and may be more, I never measured it— am not certain, won't be particular. McQ. fell close by the post of shelter to my house. Don't know how long it was exactly before I went to him after he fell. It might have been eight or ten minutes. He was dead when I got to him ; I saw him when taken up for Coroner's inquest and noticed the wounds. One made cross his shoulders like cut with a

knife, another above his collar bone, and the other below collar—looked like stuck with a knife. Knife was lying at his feet where he fell in the yard. It was a pocket knife, white handle; it was a common sized pocket knife, had blade to it; breech of gun was lying where McQ. was lying; knife was bloody. I was standing in the door when he fell, (about as far as to the door at end of jury box.) Carrol was not gone long. McQ. was lying on his face; he was bloody all along his breast, and his pockets were very bloody. Ammons remained with me until Carrol came back the first time. Ammons' hands bloody, and the fore part of his shirt bloody on the bosom.

Samuel McQuage was a very large man. McQ. came to my house that night; he pulled out his money and showed it, he had $55 in gold. He had it in a purse; he put it back in his purse and tied it, and put it back in his pocket, when he started from my door. I saw his pocket examined after his death. Small pocket knife and one five cents in silver in the bottom of his pocket. Don't know if any thing else was found in his pocket—purse and $55 not found in his pockets. Was large fire light in my house when they came, and I got up and put in another piece. The light was there during the difficulty.

Cross examination. I suppose I am near seventy years of age, fifty or sixty, or seventy, or something along there. I was excited; at times I forget like other old people. Don't remember that I stated it was forty or fifty yards from my house to yard fence at trial in Jackson. He did not tell me at my house or my door that he killed McQ. in his own defence. I heard him tell my son so at his house. I might have told he did say so at my house at Marianna, but I don't remember it; but I must have been not at myself properly if I did—he never did. I never made contrary statement to what I do now, as I remember of, before the Coroner; if

I did I must have been out of my senses, and I don't think
I was. Did you say at Marianna that you did not hear
McQuage and Ammons quarrelling? I never stated that I
did not hear a fuss, for Ammons was cursing; but I did not
hear McQuage quarrelling. I did not state before Parish
that there was a dim light in the house. Don't know that
Ammons tried to get Carrol to go home with him, but Mc-
Quage tried to get Carrol to go home with him. Don't
know how long after Ammons left my house until he was ar-
rested. Don't know which way he went when he left here.
Ammons came in morning about breakfast with us. Mc-
Quage came along, and Ammons said he was going to
Ucheeanna with him, and he accordingly left. Left Carrol
sitting in my door when I started to my son's. I found him
there when I returned; I saw the pocket examined the next
morning. I saw his sister examine the pocket some hours
after Ammons left. Ammons said McQuage had abused
his parents; I heard his mother was dead—grave near the
house in old field near by. I did not hear A. say that is
where you wanted to put me. Said he had killed a d——n
Scotchman and would kill two or three more before he
would be satified. Good long blade in knife—Ammons'
pocket knife. Star-light night; chimney in end of the house;
can't say which end. I could see out and exern. I live
now in Alabama, but house in Holmes. I said I prayed
that justice might be done; I have no prejudice against
Ammons. My husband pays my expenses. Yelverton lent
$5 to come down, to be paid again.

Re-examination. Pocket bloody on each side, and Am-
mons' hand was bloody also. But little while after McQuage
was killed until Ammons and I went up to Harry Sutley's.
While Carrol was gone, Ammons came into the house and
set on the table. He came in immediately after McQ. fell.

It was not half an hour after we came back from Harry Sutley's before Ammons left.

Cross examination. Ammon's hand was bloody when he came to the door, blood on his breast and his hands.

A. C. Munroe, says: I know the prisoner, I knew Samuel McQuage. The last time I saw Samuel McQuage was the day preceding the night on which he was killed. I saw him at Ucheeanna in the county of Walton. Ammons and McQuage came together to Ucheeanna in an ox cart; came in few yards of my store, and McQ. took the oxen out and came to the store and asked me about a land warrant, and said if I would give him what I had offered him he would let me have it, and I told him I would do so. About 12 o'clock or nearly 12 o'clock, I told him I would go home and get the money, and when I came back he left the land warrant with me to make out the transfer by Saturday, when he said he would come back. We went up to Campbell's store together, and I went to change money with Campbell in back room. I told Campbell that transfer was not made, and I wanted him to witness my payment of the money, and counted out to McQuage $64. John Ammons, Eli Right, John Campbell and Neill Campbell were present. McQuage said he would come on Saturday and make transfer, but in event of his death, requested Neill or John Campbell to assign in my name. McQuage then said to Ammons, I want you to shoot your gun off before we start as I do not like to travel with a loaded gun, or something to that effect. Ammons remarked he would not kill a man for as little money as that. Don't remember any thing more.

Cross examination. Are acquainted with road from Ucheeanna to Mrs. Sutley's—two houses between them. Ten miles between Ucheeanna and Mrs. Sutley's. Ammons and McQuage left Ucheeanna about two or three o'clock in afternoon. They left friendly; I know of no fuss

between them.  McQuage was a strong man.  They did not seem to be under the influence of liquor when they left, but they took a half gallon of liquor with them when they left. I think they took one·drink with me.  Do you not know that Mr. McQuage, when drinking, was quarrelsome?  (Objected to by State; objection sustained—excepted to.) South side of Mrs. Sutley's thickly settled.  McQ. thirty-five or forty years old.

Re-examination.  When he told Ammons to shoot off his gun, I thought McQuage was joking.  He was a man of good size.  McQuage was about grown in 1838.

Daniel Brownell says: I know John Ammons, I knew McQuage.  I was the Sheriff of Holmes county in September, 1858 ; I was ten or eleven miles behind where Ammons was first.  I went in pursuit of him; went up in Alabama to Butler county.  I first took trip on West; I was gone three days, and then came back, and went in to Alabama.  I had a warrant when I first undertook to arrest him.  I first went to his father-in-law's where his wife was. His father-in-law's name is Hodge.  This was about sun up the morning after the killing.  I did not find him there; I first came up with the prisoner in Elba, in Coffee county, Ala., one hundred and fifty miles from Holmes county to where he was taken.  He was taken about seven days after the homicide, but I will not be positive.  I helped to bring him back to Holmes county; I saw no mark of violence on the prisoner.  I had some opportunity of seeing.  I was present when prisoner was committed; I was the officer that had him in charge.

Cross examination.  I had no legal process to take him in Ala.  He did not try to get away; I went into Butler county, Ala.  A lawyer living in Elba.  Ammons more than twenty years of age ; twenty-five miles from my county to Alabama line.

Re-examination. Four persons with me when I brought the prisoner back to Fla. From Mrs. Sutley's to Hodge's three or three and a half miles.

### EVIDENCE FOR PRISONER.

Harry Sutley says: Seventh day of September, 1858, John Ammons and McQuage came to my house in the night. Ammons got out of the cart and said he was going to stop, and came into the house some hour or hour and a half before the difficulty. From the way they talked the parties appeared friendly. Ammons asked me if Joe Carrol was up at my father's, and I told him he was. Said he was going on up there to try and get him to go home with uncle Sam, (meaning McQuage.) This was between half hour or an hour in the night; saw Ammons drink some, and brought a bottle of whiskey in the house, and set it on the table. Ammons staid there between quarter, half and three quarters of an hour. It was about three quarters of an hour before my mother came. When Ammons came to edge of my yard I was standing in the door; he says don't be scared Harry, I have killed McQuage down at your father's. I said, John, you have not, have you? and he replied yes, I have, be d—d if I haven't. I asked him what he did it for, and he replied, I did it in self-defence. He said that McQuage said he was a d—d rogue, &c., and that his daddy and mammy were so before him. I asked him how he killed him, and he said he killed him with his gun and knife, and said if he was hung a thousand times he would be hung on a just cause, and if it were to do over he would do it again. I saw a couple of scratches like done with finger nails about the stomach. I went down—common pocket knife, white handle, (shows a knife.) Looked in cart next morning, pork, jug, whiskey.

Cross examination. McQuage cut or stabbed over collar bone and below; across shoulders and across the head,

which last wound was three or four inches long. Saw the gun, common sized rifle gun; it was broke off at the breech. My wife and children, and Ammons, were all that were with me, while Mrs. Sutley, my mother, was gone. Ammons part of the time in the house, and then got up and went outside of the fence to Mr. McQuage's cart. I was in the yard when Ammons went out; my wife was in the house. From my mother's to McQuage, between a mile and a half and two miles.

Re-examination. From my house to first house towards Ucheeanna, about eight miles. They had no barrel in cart when they passed my house in morning. From my mother's door to the fence, it is five or six steps. It was a star light night. Nearly day re-examined his pockets for key to send over to get burial cloth. Several present. After I first went there, I went with Ammons and Carrol up to body. When his sister re-examined his pockets, she found knives, (2,) and twenty cents; piece of tobacco. Examined cart; did not find any money; did not none of the time—Carrol. This about an hour by sun; Mr. Neal Gillis, Parish, Grimsley and Hollis were with me when the cart was examined. Ammons left my mother's three or four hours in the night.

Joseph Carrol says: Ammons came to Mrs. Sutley's with McQuage, and told me he wanted me to go home with McQ. I told him I could not as I was with old Mrs. Sutley's and could not leave her. He offered me 25 cents if I would go home with McQ. Affray occurred about an hour and half in night; tolerably light night. They seemed to be friendly. After I told Ammons I could not go with McQuage, Ammons awaked McQ. up. I took them to be friendly. McQuage asked if he could get water, I told him he could get it at the pail, and to go with me and get it. We went for the water; no quarrelling, but seemed friendly

30

up to time McQ. went to get the water. After getting the water and being there a while, I came back with him to the cart. I hitched oxen to an oak and fed them. They did not drink spirits. When I hitched the oxen I fed them. I got up in the cart where there was a barrel of pork, and the pork seemed to be at the front part of the cart and weighed down the steers' necks, and McQ. got me to get up and roll back the pork. I did not think McQ. was sober, but could travel about. Ammons appeared to be drinking some; then I got down out of the cart where McQ. was, and Ammons spoke to McQ., and asked McQ. if he had not called him dishonest that day, and McQ. replied and said, John I don't know whether I did or not, we were both drunk and fools, and John Ammons said you did ; McQ. said, if I said it once I say it again, I don't believe you are honest, and Ammons says you don't, and McQ. said I don't, and when he said that Ammons struck McQ., then McQ. commenced backing towards the fence; there Jno. Ammons kicked McQ., and McQ. then told Ammons to stand back and let him, McQ., get out of the way; by that time McQ. was getting nearer to the fence, and Ammons struck at him with the gun, he missed and the gun struck the ground close by. McQ. had got to the fence, and Ammons set down the gun by the fence. Ammons caught McQ. by his right arm with Ammons' left hand, and then he struck at McQ. two or three licks, (that way,) about the fence, showing the way in which blows were stricken, then both went over the fence together, Ammons taking his gun with him ; they both fell where they were ; McQ. arose a little first, and commenced backing, and Ammons went right after him, and McQ. was backing and begging Ammons to stand back. When McQ. had backed about seven or eight or ten steps from the fence, I heard the lick, and when I heard the lick I heard McQ. fall ; then Ammons started back towards the fence where I was

coming, and saying his mother was lying off there in the old field, and his father he did not know where he was, and no person should call them rogues and dishonest, and when Ammons came back towards me from McQ., I went around the house and went into the back door; then Ammons came to the front door and told Mrs. Sutley she need not be scared, and *said he had done just what he intended to do, and what he did not do with his gun he did with his knife, and that if he was not dead he would kill him.* I then left the house and went off after some company, and when I came back Ammons was still there, and was out in the yard, and when I went into the house and got a light to go again after company, (for I had got none,) he took the light out of my hands; he held the light over McQ. and said, that is what a man gets by calling men dishonest and d—n rogues; and I saw a gash on McQ.'s shoulder, and said, John, you have cut him, and he said yes, I did, and by G—d what I did not do with my gun I did with my knife. Mrs. Sutley did not faint as I saw; I did not rub her with camphor; when they went over the fence I was in about five feet of them; don't know which was on top; I was not excited much.

Cross examination. Fence about three feet high where they got over, or fell over. I did not see McQ. make *any attempt to strike Ammons; McQ. said to Ammons, " stand back and let a poor old man get out of his way."* When I came back from Peel's, Mrs. Sutley was in the door where I left her; McQuage fell about six or eight feet from the house opposite the corner of the house; he called McQ. and told him to get up; I was then standing on the ground by the cart; I heard no violent language from Ammons before the thing commenced at the cart; it was about fifteen steps from the cart to where the body fell.

Dr. C. McKinnon says: They came into my store that day and appeared to be friendly. Did they buy a pack of

cards at your store? Objected to; objection sustained and excepted to by counsel for prisoner.

Edward Barnes says: Did you meet McQ. and Ammons on the day preceding night of the homicide on the road? Answer: I met them about three miles and two or three hundred yards from Ucheeanna on that day. What were they doing? Answer: When I first saw them they were sitting down in the cart, and when we got pretty close to them, Mr. Ammons got up, set down on top railing of the cart body. I stepped up and looked over in the cart body, and saw some cards lying in the cart body, and a couple of pieces of tobacco lying close by. The cards and tobacco were lying on bed cover, or something spread in the bottom of the cart; they appeared to be friendly; can't say whether they were in liquor or not; saw a jug; don't know what was in it; saw a barrel in the cart. We were not with them exceeding five minutes; cart moving when I first saw it; they were behind the barrel in the cart.

Cross examination. Suppose the sun was about two hours or two hours and a half high; ox cart.

Hiram Goss says: Was not acquainted with either Ammons or McQuage. I met Ammons three miles or above, from Ucheeanna as they returned. He was in the cart; I said your playing old sledge, and they said yes, and Mr. McQ. said, we were just a playing to amuse ourselves along, and I observed to them and inquired the distance; McQ. pointed back to mile post on the side of the hill; I saw cards lying on quilt in cart; I saw a little piece of tobacco lying by the cards; they seemed to be friendly; a barrel in the fore end of the cart, which I supposed was a pork barrel; McQ. forward in the cart, and Ammons in stern; sun about two or three hours high.

Albert Parish says: I saw Ammons when brought back from Alabama, when he was brought before a Justice of the

Peace on the 18th Sept., 1858. I saw a scratch on his left side; I was five or six feet from him, the place looked a little purple. I helped to examine for McQ.'s money next morning; we examined the cart; we first examined the coat lying in the cart; this about sun up good. We found no pocket book in coat; we found no pocket book in his pocket, shattered fodder in balance of the cart. We examined the cart body and under the sides of the barrel; I went on one side and D. Neil on the other, but we found no pocket book at all; moved all the fodder and looked under each side of the barrel; I examined his pants pockets, about day light with D. Neal. We found a knife, one blade; small pocket knife. Angus Gillis and D. Neal, examined his pockets; a pipe and piece of tobacco in one pocket, a twenty cent. piece. I am certain that they are the men who examined the pockets; I am certain that McQ.'s sister did not examine; blood had run down on left side and in the pockets as he lay; if there was any, I saw no blood about the mouth of the pocket. When she testified before me, she said she had a dim light in the house, and she was afraid as they were fighting down towards the house; she was afraid they would come in the house. I knew both Mr. McQ. and Ammons. Did you ever see them playing cards at any time for money? Objected to by the State; objection sustained and excepted to.

Was or not McQuage given to card playing? Objected to by the State; objection sustained and excepted to.

What was McQuage's disposition when card playing? Objected to; objection sustained and excepted to.

Was McQuage, when dissipating, overbearing and quarrelsome in his disposition? Objected to; objection sustained and excepted to.

John Ammons' mother is said to be dead; was reputed to be dead before this difficulty. His father is alive; his

mother buried in old field called Stanley Place, about two or three hundred yards from Mrs. Sutley's; have known prisoner some six, seven or eight years, and may be more; I suppose he is about 21 or 22 years old; McQuage is a stout man, reputed a strong man; had character of brave man.

Cross examination. Small scratch about two inches long on left side, I think about the bulge of the ribs; I paid but little attention to it; Mrs. McCaskell was McQuage's sister; Angus Gillis and D. Neal, and several of the jury, were there when the pockets were searched; I don't think she searched the pockets after I got there, which was one or two o'clock; I don't remember any blood outside the pocket; don't know whether blood was inside the pockets; blood on the ground where he lay; might have been blood on the pocket, but I don't remember to have seen it.

Re-examined. Fore part of that night was a common starlight night; could not see a man very far; could see a man ten or fifteen yards from me; don't think I could have seen the arm of a man at that distance; he was lying on his face and one leg drawn up when I first got there; I saw a knife which was a white handled knife, and had been a square saw bite on it, straight blade; common pocket knife. I saw the breech of a rifle lying not far from the knife, and a barrel of a gun lying on side of a sill; I returned knife to clerk of Court; the knife I saw exhibited on trial at Marianna last Fall, was black handled knife; it was larger than the one I picked up by McQuage; some larger and heavier. McQuage was a strong man.

Benjamin Sutton says: Don't remember what time of day when pocket book was looked for; I did not look for it; don't know that any one looked for it. Daniel McQuage found in the cart a big book with $20 in it; the barrel turned and Daniel McQuage picked up the day-book with the money in it; this was when we were taking cart home

from Mrs. Sutley's, and about 150 yards from her house ; this was in the evening like. I saw nothing of day-book until Mr. McQuage found it, who handed it to Mr. Neal who was walking behind. The barrel turned a little over as we were going along; keys were in the book which contained the money ; have seen Mrs. Sutley a time or two ; don't know what her feelings are towards Ammons.

Did you or did you not ever hear Mrs. Sutley say that the defendant ought to be hung, and that she expected to see him hung? Asked for the purpose of showing a prejudice in part of Mrs. Sutley, and for no other purpose. Answer : She appeared to be angrily disposed towards the defendant. I heard her talk sorter angry about Ammons ; don't know how long she has been living in Holmes county ; had been there about two years before McQuage was killed.

John Milton says : My distinct recollection of the examination at Marianna on former trial of this case, Mrs. Sutley stated, to the best of my recollection, that Ammons said while sitting on the table in her house before she went to Harry Sutley's, that he had killed McQ. in his own defence, and also that the distance from her where she was standing to fence where McQuage was, was as far as from Court House to gate near the Court House, which witness supposed was from 35 to 40 yards.

Cross examination. She may have said it was not further than from Court House to gate.

Jesse Sutton says : I knew Joe Carrol in Alabama ; was not acquainted with his general character for honesty ; heard his neighbors talk about him pretty generally ; his character was pretty bad.

Cross examination. Heard more than three or four speak of his character ; I knew him in Barbour county, Alabama.

Albert Campbell says : I knew Joe Carrol in Alabama ;

knew his general reputation for honesty; it was tolerably bad; reputed to be dishonest.

Cross examination. I have been in Florida about twelve months; moved from Barbour county, Alabama. Came from Alabama to better myself; I lived in four miles part of the time and part of the time in half or three-quarters of a mile of Joe Carrol; it was reported in Alabama that I was indicted before I came away from there; I don't know it to be the case; don't know that it was for selling whiskey to negroes.

Re-examination. I heard I was indicted for selling whiskey.

Benjamin Sutton says: Knew his reputation in Alabama from report; bad for honesty.

Henry Jones says: I know Joe Carrol; I travelled with him from Marianna to Holmes last summer or fall. Did Joe Carrol steel a turkey on the way to Holmes, and Mrs. Sutley cook it? Objected to; objection sustained and excepted to.

D. J. Brownell, recalled by the State, says: Was present at examination before the committing Magistrate; I had charge of the prisoner as the Sheriff of Holmes county; I was with prisoner all the time during the examination. Did you see prisoner show a bruise? Witness answers that prisoner said he could show a bruise, and the State asked that the answer might be ruled out from the jury, which was done, and the prisoner excepted; I was right there with him all the time; I did not particularly; I stripped him next morning after examination, and I put shirt, pants and drawers of my own on him, and had his clothes washed; I saw no mark of violence on him; I heard Mrs. Nancy Sutley testify before committing Magistrate, she said she had a fire that night and could see, or words to that amount; don't remember that she said it was a dim fire; I have known Ammons a long time, he was counted much of a

man. About the time of the killing he was regarded as be-ing much of a man for muscular power.

Cross examination. Ammons was considered a brave man ;. I thought nothing of examining for wounds ; I was right with Ammons all the time of trial ; was attentive to all that occurred as much so as I suppose, any one else.

Re-examination. Have known Joe Carrol about two or two and a half years ; have never heard any thing wrong of him in the county where I now live.

Joseph Carrol called by the State, says : Was present at time of examination of McQuage's pockets ; one of the pock-ets had some blood on it ; on the pocket and some inside the pocket ; when it was turned to get the things out ; I will have been in Florida two years next November.

Admission by the State. Admitted by State that a bar-rel of pork in the Fall of 1858, was worth from $20 to $25.

A. C. Munroe recalled by the State. I don't know that I knew any thing about barrel of pork, except that I saw McQ. have a barrel of pork in his cart before I paid him the money about which I testified in my examination in chief.

Cross examination. One more store in Ucheeanna be-sides mine, and I was not with him all the time after I paid him the money ; he was in town an hour or two after I paid him the money.

Benjamin Sutton called by the State. I carried the bar-rel of pork from Mrs. Sutley's to Mrs. McKaskill's, who is the sister of McQuage ; I don't know whose pork it was ;. Mrs. McKaskill and McQuage lived at same place.

Cross examination. Don't remember exactly what Mrs. Sutley said about Ammons, I think she said she wished he was cut up in inch pieces ; don't remember what she said should be done with him ; don't remember much about what she did say.

31

If credit is given to this testimony and the admissions of the prisoner, there can be no doubt that the verdict of the jury was according to the evidence. It is urged, however, by the counsel for the prisoner, that they should have disregarded the testimony of Mrs. Sutley; that her manner of testifying, her expressions of ignorance on many questions, her feelings towards the prisoner, and conflicts with the other witnesses, should have rendered her testimony unworthy of credit.

Upon examining the evidence, it will be seen that attempts were made on the trial to impeach her, as well as the witness Carrol. The testimony on both sides was before the jury, and the degree of credit was with them. This Court has been frequently called on to review the question as to how far it will interfere to set aside a verdict and grant a new trial where there has been a conflict of testimony, and we have ruled as we do now, that where there is conflicting evidence, and the verdict is not manifestly against the weight of evidence, the Court will not interfere to set aside the verdict of a jury. Macon vs. Tallahassee R. R. Co., 8 Fla., 299.

In this case the credibility of the witnesses was submitted to the jury, and the jury believed the testimony. It would be something rare for this Court to decide on the degree of credit to be given to a witness, and to decide on the effect of the evidence. Were they to do so, they might justly be charged with usurping the province of the jury.

The counsel for the prisoner contends with much earnestness that the evidence discloses provocations which ought to extenuate the homicide, and that there was error in the charge of the Court, and that the charge mislead the jury.

By the statute law of this State, it is declared that, "*the common law of England, in relation to crimes and misdemeanors, except so far as the same relates to the modes*

*and degree of punishment, shall be, and the same is hereby adopted and declared to be in full force in this State."* Thom. Digest, 489.

By reference to the common law of England as laid down in 1 Russell on Crimes, page 514, it will be seen that the charge is in the very words of the law as there stated. We are, therefore, of the opinion, that there was no error in the charge of the Court, and that the judgment of the Court upon the verdict was in conformity with the law and according to the evidence. The judgment of the Court below is therefore affirmed.

Let this case be remanded to the Circuit Court in and for the county of Calhoun, and the judge holding said Court be directed to cause the said John Ammons to be brought before him in open Court, and nothing appearing why sentence of death should not again be passed upon him, said Judge, in open Court, do sentence the said John Ammons to be executed at such time and place as the Court may deem fit and proper, and that said Court do cause said sentence to be carried into execution.